**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARK J. RYCHEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-1514 |
| | ) | Judge Nora Barry Fischer |
| LANE YATES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.     INTRODUCTION

This case is a diversity action arising out of Plaintiff Mark J. Rychel's suit against Defendant Lane Yates and Michael Quickel, Jr. alleging breach of contract and fraud in the inducement to form a contract. (*See* Docket No. 20). Plaintiff is a resident of Pennsylvania, and Defendants are residents of North Carolina. (*Id.* at ¶¶ 2-4).

Presently before the Court is a jurisdictional dispute concerning Defendants' argument that this Court lacks personal jurisdiction over them, such that Plaintiff's claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons that follow, this Court finds that it does not have personal jurisdiction over Defendants. Rather than dismiss the case outright, however, the Court will exercise its discretion and transfer this matter to the Western District of North Carolina for further consideration.

### II.     PROCEDURAL BACKGROUND

On November 12, 2009, Plaintiff initiated the instant action by filing his original Complaint in the Western District of Pennsylvania. (Docket No. 1). Defendants each filed Motions to Dismiss for lack of jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. (Docket Nos. 10, 13). Plaintiff was granted leave to file an

Amended Complaint on March 19, 2010, and filed his Amended Complaint on April 5, 2010. (Docket Nos. 19, 20). In response, Defendants again filed Motions to Dismiss based on the grounds stated in their original Motions to Dismiss. (Docket Nos. 21, 23).

After briefing had concluded on these later motions, the Court issued a Memorandum Opinion and Order on June 9, 2010, which denied Defendants' Motions to Dismiss the Amended Complaint, without prejudice. (Docket Nos. 28, 29). As part of its holding, the Court ordered limited discovery on issues related to the question of personal jurisdiction to occur in the next ninety days.[1] (*Id.*). The opinion also permitted Defendants to renew their respective motions once said discovery was complete. (Docket No. 28 at 10).

On September 13, 2010, having been advised that jurisdictional discovery had been completed by the September 10, 2010 deadline, the Court convened a status conference with counsel for the parties. (*See* Docket No. 32). At this conference, Defendants stated their intent to renew their respective motions to dismiss due to an alleged lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Plaintiff then proposed, given the circumstances of the parties' dispute, that an evidentiary hearing was required to aid the Court in its determination, to which both Defendants objected. (*See Id.*). The Court ordered the parties to brief the issue and said briefing concluded on October 5, 2010. (Dockets No. 34, 36, 39). After considering the

---

[1] Specifically, as stated in the Court's Order dated June 9, 2010, Plaintiff was permitted limited discovery on the following issues, for the purposes of establishing whether jurisdiction properly lies with the Court:

1. The extent and nature of Defendants' contact with the state of Pennsylvania.

2. The relationship between Sergio Radovcic and Defendants, and specifically any evidence that he acted as their agent in this matter.

3. The representations of Defendants or Sergio Radovcic to Plaintiff regarding Mr. Radovcic's relationship to Defendants.

4. Defendants' alleged intent to aim their conduct at the state of Pennsylvania.

(Docket No. 29 at 1-2).

arguments presented, the Court exercised its discretion and granted Plaintiff's Motion for an Evidentiary Hearing.  (Docket No. 40).

Subsequently, beginning on December 2, 2010, and continuing on December 15, 2010, this Court held an evidentiary hearing on whether the Court has personal jurisdiction over Defendants.  (*See* Docket Nos. 44, 46).  Transcripts were prepared, (Docket Nos. 45, 48), and the parties have filed their proposed findings of fact and conclusions of law, (Docket Nos. 49, 50, 51, 52, 53).  Thus, this disputed matter has been fully briefed and is ripe for disposition on the issue of jurisdiction.

III.    FACTUAL BACKGROUND

A.      *Plaintiff's Introduction to Sailview*

Plaintiff is a certified financial planner who manages his own firm in Allegheny County, Pennsylvania.  (Docket No. 45 at 6-7).  In June 2005, a client of Plaintiff's financial planning business sought Plaintiff's assessment of a potential real estate development in the Turks & Caicos Islands.  (*Id.* at 7-8).  For this purpose, Plaintiff was introduced to Sergio Radovcic, who he initially hosted at an investment presentation held at Plaintiff's office located in Wexford, Pennsylvania.  (*Id.* at 7-9).  At the time, Mr. Radovcic maintained a business in Green Tree, Pennsylvania.  (*Id.* at 16, 22).  During the presentation, Mr. Radovcic described an alternative real estate investment opportunity, which was also to be sited in the Turks & Caicos Islands.  (*Id.* at 9).  The name of this development project was "Sailview Development Ltd."[2] ("Sailview"). (*Id.*).

_____

[2] Sailview Development Ltd. is a corporation that was organized and incorporated under the laws of Turks & Caicos to develop a hotel and condominium project located on the island of Grand Turk, in the Turks & Caicos Islands, to be known as "Sailview Resort."  (Docket No. 48 at 6, 91-92).  Defendants Quickel and Yates are shareholders and directors of Sailview Development Ltd.  (*Id.* at 6, 91).  David O'Connell, a resident of South Carolina, and Peter Dauwe, a resident of Scotland, are the company's other shareholders.  (*Id.*).   Sailview Development Ltd. is not a party to this action.  (*See* Docket No. 20).

Although neither he nor his client became involved in the original investment opportunity, Plaintiff was interested in investing from his own account with respect to Sailview and met with Mr. Radovcic in connection with this interest on multiple occasions in July 2005. (*See Id.* at 7-10). Plaintiff expressed his personal interest in Sailview to Mr. Radovcic and the two men discussed the development project throughout their meetings, which occurred at Plaintiff's office and at his residence in Sewickley, Pennsylvania. (*Id.* at 9-10). Mr. Radovcic did not distribute written materials focused on Sailview as part of these discussions. (*Id.* at 99). All together, Plaintiff and Mr. Radovcic had three or four face-to-face meetings. (*Id.* at 10).

       B.       *Pre-Contract Negotiations*

During their communications, Mr. Radovcic presented Sailview to Plaintiff as a unique opportunity in the Turks & Caicos Islands because, unlike other similarly located real estate investments, a purchaser in Sailview would have the ability to finance his or her purchase, as opposed to simply paying cash for the property. (*Id.* at 14-15). Mr. Radovcic did not have an employment or agency agreement with Sailview, nor was he engaged by either Defendant in a personal capacity. (Docket No. 48 at 38, 99). Instead, Mr. Radovcic presented himself to Sailview as someone in the banking and brokering business. (*See Id.* at 37, 101). Through Mr. Radovcic, Plaintiff came to know Defendants. (Docket No. 45 at 12-13; *see also* Docket No. 48 at 57-58, 118). Despite his representations to the contrary, Mr. Radovcic never obtained funding for Sailview, nor was he able to provide financing for any Sailview purchaser. (Docket No. 48 at 38, 103-04). In fact, through their respective interactions with him, both Plaintiff and Defendants became uncomfortable with Mr. Radovcic based on what they learned of his prior relationships. (Docket No. 45 at 21-22, 112-13). Notably, Sailview did not direct Mr. Radovcic

to locate purchasers for its development and, consequently, he was never paid a commission or any other payment by the company. (Docket No. 48 at 38-39, 114).

Defendants were not seeking investors for Sailview in July 2005. (Docket No. 48 at 58). Yet, on July 19, 2005, Plaintiff, Defendants, as well as Anthony Agostinelli, participated in a telephone conference call wherein Plaintiff expressed an interest in purchasing a condominium unit in Sailview. (Docket Nos. 45 at 25-26, 48 at 104-05). During this call, Defendants discussed Sailview's design elements, projected design, construction and development schedules, and future marketing plans. (Docket No. 48 at 12). Defendants also discussed financing and sales for the project, including the price and location of Plaintiff's desired unit. (*Id.* at 125). Mr. Radovcic and the parties' physical locations, however, were not discussed during the call. (*Id.* at 12-14). The phone conversation lasted between seventy-five and ninety minutes. (*Id.* at 12).

Shortly after the conclusion of the July 19, 2005 phone call, Defendant Quickel sent an email to Plaintiff and Mr. Agostinelli, carbon copy to Defendant Rychel, which stated:

> Gentlemen,
>
> Thank you for the time tonight. If we can do anything to help your diligence let us know.
>
> Regards,
> Bo

(Pl.'s Ex. 1).[3] Attached to said email were four portable document files ("pdf") depicting the first conceptual drawings of Sailview. (*See Id.*; *see also* Docket No. 48 at 15). The drawings were prepared by an architect firm based out of North Carolina and included the following:

> Sales Information: Sailview Limited, Inc. Bo Quickel. Lane Yates. 249 Williamson Road. Suite 101. Mooresville, North Carolina. 28117. T: 704.425.1600. F: 704.696.2663.

---

[3] Plaintiff received the July 19, 2005 email from Defendant Quickel at his work email address, which at that time could only be accessed from his office location in Wexford, Pennsylvania. (Docket No. 45 at 88).

(Pl.'s Ex. 1; Docket No. 48 at 16).  Ultimately, neither Plaintiff nor Mr. Agostinelli responded to Defendants' offer of assistance with respect to their diligence.  (Docket No. 48 at 15).

Subsequent to the initial conference call, there were four or five additional conference calls between Plaintiff and Defendant Yates.  (Docket Nos. 45 at 25, 48 at 17, 106).  These calls were initiated by Plaintiff.  (Docket No. 48 at 106).  Daniel Costa, a partner in Plaintiff's financial planning business, was present for some of these calls, along with Mr. Agostinelli. (Docket No. 45 at 145-48).  In addition, Plaintiff's wife and brother, who resided in Illinois, were also present for at least one call.  (*Id.* at 146-48).

After the completion of his investigation of Defendants and Sailview, Plaintiff determined that he wanted to move forward with the purchase of a condominium unit in Sailview.  (*See Id.* at 26).  Thus, on July 21, 2005, Defendant Quickel sent an email to Plaintiff, carbon copy to Defendant Yates, wherein he references two attachments.  (Pl.'s Ex. 2). Specifically, the documents attached to the July 21, 2005 email were:  (1) wire instructions for Misick & Stanbrook,[4] which instructed Plaintiff how he should transmit the first payment for his intended purchase, and (2) a reservation agreement for a penthouse unit at Sailview.  (*Id.*; *see* Docket No. 48 at 17).  The next day, Plaintiff forwarded the email to Leilani Costa, who is an attorney located in Pittsburgh, Pennsylvania and the wife of Plaintiff's business partner.  (Pl.'s Ex. 2).  It is unclear if she reviewed the documents or if she offered any proposed changes.  (*See* Docket No. 45 at 150-51).

Subsequently, Defendant Quickel faxed Plaintiff a copy of a reservation agreement between Plaintiff and Sailview, which was dated July 23, 2005 and was addressed to Plaintiff's

---

[4] Misick & Stanbrook is a law firm located in the Turks & Caicos Islands that represented Defendants with regard to Sailview.  (Docket No. 48 at 125).

business location in Wexford, Pennsylvania.[5]  (Pl.'s Ex. 3).  Misick & Stanbrook handled the

negotiation of said agreement on behalf of Sailview and drafted the document.  (Docket No. 48

at 20-21).  The agreement was then sent from the law firm to Defendant Quickel via email, who

signed the document in his capacity as a director of Sailview before sending the aforementioned

fax to Plaintiff.  (*Id.* at 19-20).   According to the written agreement, because no sale and

purchase agreement for the penthouse unit had been executed at that time, in consideration of

Plaintiff's advance of $250,000, Sailview agreed to give Plaintiff a 30% discount on the

published price for penthouse units, the total cost of which would not exceed $953,000.[6]  (Pl.'s

Ex. 3).  This sum of money was needed for the acquisition of the land on which Sailview was to

be constructed.  (Docket No. 45 at 30, 173).

C.      *Original Option Agreement*

One week after the parties' initial telephone conference call, Defendant Quickel faxed a

second document to Plaintiff, which was entitled "Option Agreement" and was dated July 25,

2005.[7]  (Pl.'s Ex. 4).  Similar to the reservation agreement, Misick & Stanbrook drafted the

document, which was then emailed to Defendant Quickel, who signed the agreement prior to its

transmission to Plaintiff.  (Docket No. 48 at 21-22).  Although identified by the text of the

---

[5] The Court notes that the fax in question was sent to Plaintiff's business fax number, which contains a 724 area code.  (*See* Pl.'s Ex. 3).  Defendant Quickel testified that he is not familiar with the geographic region corresponding to said area code.  (*See* Docket No. 48 at 62).

[6] Plaintiff did not finance his investment in Sailview through Mr. Radovcic and, instead, assembled a group of investors consisting of family members, friends, and/or business associates for this purpose.  (*See* Docket No. 45 at 152).  Specifically, in addition to Plaintiff, the following individuals also contributed to the investment:  Eric Rychel (Chicago, Illinois), Joe Rychel (Pittsburgh, Pennsylvania), Albert Agostinelli (Pittsburgh, Pennsylvania), Anthony Agostinelli (Pittsburgh, Pennsylvania), Daniel Costa (Pittsburgh, Pennsylvania), and Anthony Mazerello (Boston, Massachusetts).  (*Id.* at 147 , 152-53).  Plaintiff was the "public face" of the investor group and, beyond him, none of the other capital investors executed an agreement with either Defendant or Sailview.  (*See Id.* at 31).  Notably, the record is devoid of evidence that Defendants, either individually or in their capacity as directors of Sailview, knew of the existence of all of Plaintiff's investors or their states of residence.

[7] Like the reservation agreement, the Court again notes that the original option agreement was faxed to Plaintiff's business fax number.  (*See* Pl.'s Ex. 4).

document as a party to the agreement, Defendant Yates did not sign the Option Agreement.[8]
(Pl.'s Ex. 4).  Defendants had limited involvement in the negotiation of said agreement.  (Docket
No. 48 at 21, 109).  In fact, but for Defendants' offer made during the July 19, 2005 conference
call to discount the price of Plaintiff's condominium purchase, the negotiation of the Option
Agreement was handled entirely by Misick & Stanbrook.  (Docket No. 48 at 21, 109, 125).

According to the provisions of the Option Agreement, "[i]n consideration of the making
of the Advance to Sailview by [Plaintiff] at the request of [Defendants], [Defendants] do hereby
grant the Put Option to [Plaintiff]."  (Pl.'s Ex. 4).  "Advance" and "Put Option" are defined terms
within the agreement.  (*Id.*).  Specifically, pursuant to section 1.1, "Advance" was defined to be
the payment of $953,000 to be made by Plaintiff to Sailview.  (*Id.*).  Likewise, pursuant to
sections 1.8 and 2.2, respectively, under the "Put Option," Plaintiff was provided with a period of
time within which to require Defendants to either repay the Advance, if Plaintiff and Sailview
had not yet entered into a "Sale and Purchase Agreement," or to take an assignment of said "Sale
and Purchase Agreement" if one had been executed.[9]  (*Id.*).  In the event that Plaintiff and
Sailview entered into a purchase agreement related to the penthouse unit, the Option Agreement
provided that "the Advance shall be deemed to be applied in payment of the full purchase price
under the Sale and Purchase Agreement."  (*Id.*).  The Option Agreement stated that "[a]ll monies
to be paid hereunder or pursuant to the exercise of the Put Option shall be funds immediately

---

[8] Specifically, the Option Agreement provides, in pertinent part:

THIS AGREEMENT is made this 25 [sic] day of July 2005 BETWEEN MARK RYCHEL, 2000
Corporate Drive, Suite 210, Wexford, PA 15090, USA … of the ONE PART and LANE YATES
and MICHEAL [sic] QUICKEL JR. both c/o Yates Development, L.L.C., P.O. Box 2097,
Cornelius, NC 28031, USA … of the OTHER PART.

(Pl.'s Ex. 4).

[9] Under section 1.5 of the Option Agreement, "Sale and Purchase Agreement" was defined to mean "an
agreement for the sale of the Property to be made between [Plaintiff] and Sailview, the terms of which are currently
being negotiated."  (Pl.'s Ex. 4).

negotiable at par in the Turks & Caicos Islands." (*Id.*). Finally, as indicated in section 5.1, the obligations of each Defendant under the Option Agreement were to be "joint and several." (*Id.*).

When Defendant Quickel faxed the Option Agreement to Plaintiff, there were no handwritten changes displayed on the document. (Docket No. 48 at 23). Thereafter, the typed language of section 1.1, which defined "Advance," was revised by handwritten notations to set forth four installment payments to be made in July 2005, on September 15, 2005, on May 15, 2006, and on July 15, 2006, the sum of which totaled $953,000. (Pl.'s Ex. 4). In addition, the "Option Period" set forth in section 1.6 was expanded from 12 to 24 months and the option granted to Plaintiff in section 2.2 was amended to permit Plaintiff to recover interest at the U.S. prime lending rate, in addition to the Advance. (*Id.*). Lastly, the choice-of-law provision contained in section 3.1 electing the application of Turks & Caicos law was crossed out and replaced with Pennsylvania. (*See Id.*).

Plaintiff initialed the handwritten revisions in the Option Agreement and signed the document. (*Id.*; Docket No. 45 at 34-36). Plaintiff did not, however, transmit his acceptance of the agreement to Defendant Quickel or Yates or send the signed agreement to either of them. (*See* Docket No. 45 at 36). Instead, Plaintiff gave the signed Option Agreement to Mr. Agostinelli, as well as a check for $250,000 representing the initial installment of the Advance under the handwritten terms of the agreement, and decided, along with his co-investors, that Mr. Agostinelli would travel to the Turks & Caicos Islands carrying same.[10] (*Id.* at 32-33, 36, 167-68, 170-71, 177; Docket No. 48 at 23). Once in the Turks & Caicos, Mr. Agostinelli was supposed to make a final determination of whether to go forward with the investment. (Docket No. 45 at 32-33). Ultimately, Mr. Agostinelli had the authority to walk away from the

---

[10] Mr. Agostinelli is an airline pilot by trade. (Docket No. 45 at 174).

transaction if he was not satisfied after meeting with Defendants and Sailview's sales team. (*Id.* at 167).

In late July 2005, Mr. Agostinelli travelled to the Turks & Caicos Islands. (*Id.* at 167-68). While there, he met each Defendant and was introduced to two additional persons who were part of Sailview's sales team. (*Id.* at 168, 176). Mr. Agostinelli also encountered Mr. Radovcic during this trip; however, he neither recalls who introduced him nor remembers if he was identified as a member of the sales team. (*Id.* at 168-69, 176-77). According to Mr. Agostinelli, the purpose of his trip, in addition to meeting with Defendants, was to have the handwritten changes to the Option Agreement initialed and to deliver the $250,000 check. (*Id.* at 167-68). As to the former, he reported that he would not have been comfortable releasing the money without said initialing. (*See Id.* at 178).

While he was in the Turks & Caicos, Mr. Agostinelli made the decision to proceed with the transaction. (*Id.* at 173-74). This determination was made by Mr. Agostinelli individually, as he did not seek further approval or input from Plaintiff or any other investor after he arrived on the islands. (*Id.* at 173). Mr. Agostinelli presented the Option Agreement containing the handwritten revisions, which had been initialed by Plaintiff, to Defendant Quickel during a real estate closing for the land that was supposed to be the future site of Sailview. (*Id.* at 170; Docket No. 48 at 24, 108). This marked the first time that Defendant Quickel saw the changes that had been made to the Option Agreement and, as a result, he asked an attorney from Misick & Stanbrook to review the revisions during the closing. (*See* Docket No. 48 at 26). Defendant Quickel initialed the changes to sections 1.2, 1.6, and 2.2. (*Id.* at 25). However, at the suggestion of the attorney, he added North Carolina to section 3.1, the choice-of-law provision, prior to initialing same. (*Id.* at 26).

Although Defendant Yates was informed that Mr. Agostinelli would be carrying a check to the Turks & Caicos, he did not know that he also had a signed copy of the Option Agreement with him. (*Id.* at 108). In this regard, Defendant Yates stated that he did not receive a copy of the signed agreement and that no one asked him to either sign or initial the document. (*Id.* at 109). Accordingly, despite his identification as a party pursuant to the terms of agreement, Defendant Yates did not sign or initial the Option Agreement at any time. (*See Id.* at 109-10).

After Defendant Quickel had affixed his initials next to the handwritten revisions in the Option Agreement, Mr. Agostinelli hand-delivered the $250,000 check. (Docket No. 45 at 168-72). Mr. Radovcic was not referenced or discussed at that time. (Docket No. 48 at 26). As noted by the Option Agreement, at the time the agreement was executed, Plaintiff was negotiating with Sailview for the purchase of a condominium unit. (Pl.'s Ex. 4). Thus, Plaintiff understood that subsequent payments under the Option Agreement were to be made – and were made – to a bank account maintained for Sailview by Misick & Stanbrook in the Turks & Caicos. (Docket No. 45 at 114; Docket No. 48 at 26-27).

D.     *Post Option Agreement*

On July 31, 2005, Defendant Yates sent an email to Plaintiff, carbon copy to Defendant Quickel, with a subject line entitled "Welcome to the team." (Pl.'s Ex. 6). In the email, Plaintiff was instructed to "[t]ake a good look at [his] client contact list and identify anyone in the senior management of branded name resorts." (*Id.*). The email also indicated that Defendant Yates intended to "meet with [Plaintiff] in the next week or two as well as make contact with a few names that might be very unique in flagging Sailview." (*Id.*). In this regard, the email relates to Plaintiff's offer to lend his assistance to Sailview in its effort to secure a "flag" for its

development.[11]  (*See* Docket No. 45 at 65, 69; *see also* Docket No. 48 at 111, 132-34, 136).
Previously, Defendant Yates had informed Plaintiff that Sailview had already secured a letter of
intent from the Westin Hotel for the management and operation of a hotel as part of the Sailview
development.  (Docket No. 48 at 111).  However, Plaintiff volunteered to identify other potential
options.  (*See* Docket No. 45 at 63).  For this purpose, through Plaintiff, Sailview was introduced
to David Rowe, who at that time was the Senior Vice-President of Interstate Hotels.  (Docket No.
45 at 69).  According to Defendant Yates, Mr. Rowe was a "hospitality headhunter" who would
have been able to provide Sailview with employees for the hotel aspect of the development.
(Docket 48 at 73).

Plaintiff, Defendants, and two other persons associated with Sailview—Peter Dauwe and
Caroline Thomas—participated in a telephone conference call on August 3, 2005.[12]  (*See* Pl.'s
Ex. 7).  The conversation included a discussion of the value of a flag in selling the development
to individual purchasers and how Sailview should go about obtaining a flag contract.  (*See Id.*;
*see also* Docket No. 45 at 70).  Later that day, Mr. Dauwe and Ms. Thomas sent an email to
Plaintiff and Mr. Rowe, carbon copy to each Defendant, wherein they purported to summarize
their understanding of the topics discussed.  (Pl.'s Ex. 7).  In response, Defendant Yates sent a
reply email addressed to the same list of people, referencing the previous email and indicating
that any potential flag should present a strategic marketing plan, as well as a projection of nightly
occupancy rates.  (*Id.*).

---

[11] According to Defendant Yates, a "flag" is a hotel franchise that contracts with a developer, wherein the
franchise enters into an agreement to manage and operate a hotel within the development project.  (Docket No. 48 at
110-11).

[12] As previously noted, Mr. Dauwe is a resident of Scotland and is a minority shareholder in Sailview,
holding a 5% interest.  (Docket No. 48 at 6, 91).

Thereafter, Plaintiff and Defendant Yates exchanged a series of emails, also on August 3, 2005, wherein Plaintiff provided Mr. Rowe's cell phone number and availability to which Defendant Yates proposed setting up a meeting to discuss the final flag negotiations, as well as the availability of two penthouse units to be offered to Plaintiff's personal contacts.[13]  (*Id.*; Pl.'s Ex. 8).   In this regard, Defendant Yates' email relates to Plaintiff's efforts to locate other potential buyers for Sailview from within his client list.  (Docket No. 48 at 112).  As stated in the email:

> If your personal contact would want one of the [two remaining Ocean-Front Penthouses], [Sailview] would discount the unit 5%, 4% of which would normally be the commission paid to Savills[14] if they procured the sale, 1% as an extra incentive.  For the 5% discount, the [penthouse] unit would need to be purchased with an up-front $150k deposit [versus] $250 (sic) in August, proceeded by a similar agreed payment structure.

(Pl.'s Ex. 8).  Any purchases by Plaintiff's prospective buyers would have been made through Sailview.  (Docket No. 48 at 114).

On August 5, 2005, Plaintiff, Defendant Yates, Mr. Rowe, and Colin Dunkley—a client and personal friend of Plaintiff who was and remains the head of International Development for Interstate Hotel—participated in an additional conference call regarding the flagging of Sailview.[15]  (Docket No. 45 at 78, 154).  According to Plaintiff, Mr. Dunkley's employment required that he travel around the world to develop large resort properties.  (*See Id.* at 154).  Thus, as a courtesy to Plaintiff, Mr. Dunkley offered to review information related to Sailview

---

[13] The Court notes that the telephone number provided as Mr. Rowe's contains a 719 area code.  (*See* Pl.'s Ex. 7).  Defendant Yates testified that he is not familiar with the geographic region that corresponds with said area code.  (Docket No. 48 at 113-14).

[14] According to Defendant Quickel's testimony, Sailview hired Savills, which was based out of London, England, to handle its international marketing and sales and a company owned by Mr. O'Connell, which was based out of South Carolina, to handle domestic sales.  (Docket No. 48 at 8).  As previously noted, like Mr. Dauwe, Mr. O'Connell is also a minority shareholder in Sailview who holds a 5% interest.  (*See Id.* at 6).

[15] Plaintiff testified that Mr. Dunkley's employment was based out of either Pittsburgh, Pennsylvania or Washington, D.C. at the time in question.  (Docket No. 45 at 154-55).

during his personal time and at no cost. (*Id.*). Ultimately, Sailview did not open a hotel and, as a consequence, Mr. Rowe was never used to hire employees for same. (Docket No. 48 at 73-74).

In addition to offering assistance to help Sailview locate potential flags for its development, Plaintiff also offered to assist in the editing of Sailview's business plan. (*Id.* at 111). The plan itself was drafted by Defendant Yates for use with either a flag hotel or an institutional lender. (*Id.*). When the need for such a plan was mentioned to Plaintiff, he offered that his wife, who holds a degree in communications, could potentially lend some support. (*Id.*). The record does not reflect whether Plaintiff's wife was utilized in this regard or not.

### E. *Second Unit in Sailview*

On August 16, 2005, Plaintiff sent an email to Defendant Yates, wherein he stated that "[w]e need to talk about the paperwork for the second unit" and expressed a desire to conduct a telephone call for that purpose. (Pl.'s Ex. 10). This email related to negotiations that were ongoing at that time regarding Plaintiff's purchase of a second condominium unit in Sailview. (Docket No. 45 at 79). Said negotiations began shortly after the initial Option Agreement was executed, given Sailview's need for additional capital and Plaintiff's desire to obtain the discounted pricing, (*see* Pl.'s Ex. 6; *see also* Docket No. 45 at 79), and concluded at some point in August 2005, when Plaintiff decided to move forward with the purchase of a second unit in Sailview under an option agreement with terms almost identical to the original agreement, including the handwritten revisions, (*see* Defs.' Ex. 2; *see also* Docket No. 45 at 73).[16] Notably, as was the case in the Option Agreement dated July 25, 2005, Defendant Yates, although again

---

[16] Whereas the handwritten notations to section 1.1 of the Option Agreement dated July 25, 2005 provided for an Advance of $953,000 to be made in four installment payments in July 2005, on September 15, 2005, on May 15, 2006, and on July 15, 2006, section 1.1 of the Option Agreement dated August 20, 2005 provided for an Advance of $255,000 to be made in three equal installment payments on August 30, 2005, May 15, 2006, and June 15, 2006. (*Compare* Pl.'s Ex. 4, *with* Defs.' Ex. 2).

identified by the text of the document as a party to the agreement, did not sign the subsequent Option Agreement dated August 20, 2005. (*See* Defs.' Ex. 2). Thereafter, in an email sent on August 31, 2005, Plaintiff wrote to Defendant Yates that he "wired the $335,000 today." (Pl.'s Ex. 11). The $335,000 payment was the sum of the second installment payment under the initial Option Agreement and the first installment payment under the latter. (Docket No. 45 at 80).

F.    *Amendment and Joinder to the Original Option Agreement*

As time progressed and it became apparent that the Sailview development was having some difficulty getting off of the ground, Plaintiff and his co-investors became concerned for their capital investment. (*Id.* at 82). In this regard, Plaintiff testified that because of his increasing apprehension, he grew reluctant to make continued payments under the initial Option Agreement. (*Id.*). Plaintiff communicated his concerns to Defendants, including his desire to refrain from final payment prior to seeing some further movement within the development. (*Id.*; *see* Pl.'s Ex. 12).

In early July 2006, Plaintiff's attorney, Ms. Costa, drafted a document, which was entitled "Amendment and Joinder to Option Agreement." (Pl.'s Ex. 12; *see* Docket No. 45 at 87; *see also* Docket No. 48 at 34). Neither Defendant Quickel nor Yates had any role in drafting or negotiating the amended agreement. (Docket No. 48 at 33-34). Plaintiff sent the amended agreement to Defendant Yates by email on July 10, 2006. (Pl.'s Ex. 12). Defendant Yates then forwarded Plaintiff's email and attachment to Defendant Quickel the next day, stating that "[Plaintiff] sent some proposed amendments to his purchase sales contract, please review them and let's discuss them in person once we get through our meetings this week." (*Id.*). Pursuant to the terms of the Amendment and Joinder to Option Agreement, the time frame during which Plaintiff was obligated to make the final payment for his penthouse unit was extended until

November 30, 2006 and the Option Period was similarly extended until July 25, 2007.[17] (Pl.'s Ex. 5). In addition, the choice of law provision was modified to recite that the agreement was to be governed by Pennsylvania law, with no reference to North Carolina.[18] (*Id.*). According to the amended agreement, "[Defendant Yates] inadvertently did not execute the [Option Agreement dated July 25, 2005] and wishes to join and be bound by all of the terms and conditions of the Option Agreement and this Amendment." (*Id.*).

In response to Plaintiff's email, Defendant Quickel sent an email addressed to Plaintiff, carbon copy to Defendant Yates, on July 18, 2006. (*Id.*). In this email, Defendant Quickel stated that the "directors of Sailview [were] the protectors of [its] investors and buyers (sic) dollars" and that "[t]he project will be ramping up to go vertical beginning July 24th, 2006, approximately 7 months behind the original planned start date." (Pl.'s Ex. 12). According to Defendant Quickel's testimony, at the time of his email, the plans and zoning for the Sailview development were completed and the government contracts were in place. (Docket No. 48 at 69). The property on which the development was to be located had been appraised for $9.9 million as raw land and upwards of $400 million as of the completion of the first phase of development. (*Id.* at 77). In addition, Sailview had just finalized a deal with Davis Capital, based in Charlotte, North Carolina, which was prepared to pay Sailview $40 million dollars to become an equity partner in the project. (*Id.* at 70).

---

[17] By agreement of the parties, on August 29, 2007, the Option Period was further extended to April 20, 2008. (Pl.'s Ex. 5). Plaintiff, however, does not contend that the August 2007 amendment is relevant to the Court's inquiry regarding personal jurisdiction over Defendants Quickel and Yates. (Docket No. 45 at 39-40).

[18] The Court notes that section 1.3 of the Amendment and Joinder to Option Agreement also provides a more detailed description of the relevant penthouse unit than was contained in the initial Option Agreement. (*Compare* Pl.'s Ex. 4, *with* Pl.'s Ex. 5).

Unlike the previous two option agreements, Plaintiff and Defendants each signed the Amendment and Joinder to Option Agreement dated July 20, 2006.[19] (*See* Pl.'s Ex. 5). To this end, Plaintiff sent a signed copy of the agreement to Defendant Quickel by either mail or fax. (Docket No. 48 at 33). It is unclear from the record whether Defendant Quickel or Defendant Yates signed the agreement next. (*Id.* at 34). In either event, after both Defendants signed the document, it was then sent back to Plaintiff. (*Id.*). To this date, there has been no physical development on the land acquired by Sailview and the project has been acknowledged as a failure.

IV.    LEGAL STANDARD

   A.    *Standard of Review*

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for lack of jurisdiction over the person. Fed. R. Civ. P. 12(b)(2). A defendant bears the initial burden of raising a lack of personal jurisdiction defense. *See* Fed. R. Civ. P. 12(h)(1); *National Paintball Supply, Inc. v. Cossio*, 996 F. Supp. 459, 460 (E.D. Pa. 1998). However, "[w]here the defendant has raised a jurisdictional defense, the plaintiff bears the burden of establishing either that the cause of action arose from the defendant's forum-related activities (specific jurisdiction) or that the defendant has 'continuous and systematic' contacts with the forum state (general jurisdiction)." *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros, Inc.*, 983 F.2d 551, 554 (3d Cir. 1993). If no evidentiary hearing is held on the motion to dismiss, "the

---

[19] As stated in the Amendment and Joinder to Option Agreement:

This AMENDMENT AND JOINDER TO OPTION AGREEMENT (this "Amendment") is made this 20th day of July, 2006 by and among MARK RYCHEL having an address at 2000 Corporate Drive, Suite 210, Wexford, PA 15090 USA ("MR") and LANE YATES (individually, "Yates"; together with Quickel, "Yates Quickel") and MICHAEL QUICKEL JR., ("Quickel"; together with Yates, "Yates Quickel"), both having an address at c/o Yates Development, L.L.C., P.O. Box 2097, Cornelius, NC 28031, USA.

(Pl.'s Ex. 5).

plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). By contrast, "if the Court conducts an evidentiary hearing, the plaintiff has the more substantial burden of proving that personal jurisdiction is proper by a preponderance of the evidence." *Leone v. Cataldo*, 574 F. Supp. 2d 471, 477 (E.D. Pa. 2008) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)).

        B.      *Motions to Dismiss for Lack of Personal Jurisdiction*

        The Due Process Clause protects defendants from binding judgments of foreign states with which the defendants had no significant "contacts, ties, or relations." *Burger King v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe v. Wash.*, 326 U.S. 310, 319 (1945)). Due process requires that a defendant be provided a "fair warning" and a "degree of predictability" regarding how his conduct may subject him to legal process and liability in a particular forum. *Burger King*, 471 U.S. at 472.

        To exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998). First, a court must determine whether the applicable state jurisdictional statute allows it to exercise jurisdiction under the circumstances of the particular case. *Id.* at 259. Second, a court must determine whether the reach of the state statute comports with the Due Process Clause of the Federal Constitution. *Id.* In Pennsylvania, where the relevant long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States," 42 Pa. Cons. Stat. § 5322(b), this inquiry is collapsed into a single step, i.e., whether the Federal Constitution allows the state to exercise

personal jurisdiction over the defendant. *See IMO Indus.*, 155 F.3d at 259. The constitutional test used to answer this question depends upon whether the jurisdiction sought is "general" or "specific." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984); *see also Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992).

Only specific jurisdiction is relevant to this matter. "Specific jurisdiction" is "personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros*, 466 U.S. at 414 n.8. To establish specific personal jurisdiction, a plaintiff must show that a defendant had fair warning that he or she was subject to legal process in a particular state because the defendant had "minimum contacts" with the state. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citing *Burger King*, 471 U.S. at 472).

In general, a court must analyze questions of personal jurisdiction on a defendant-specific basis. *Miller Yacht Sales*, 384 F.3d at 95 n.1. Similarly, a court usually determines specific jurisdiction on a claim-by-claim basis. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 318 n.3 (3d Cir. 2007) (citing *Remick v. Manfredy*, 238 F.3d 248, 255-56 (3d Cir. 2001)). "Claim specific analysis is appropriate for analyzing a case with both contract and tort claims because 'there are different considerations in analyzing jurisdiction over contract claims and over certain tort claims.'" *Cataldo*, 574 F. Supp. 2d at 477 (quoting *Manfredy*, 238 F.3d at 255-56).

C.    *Acts of an Agent*

Federal Rule of Civil Procedure 4(k) authorizes a court to have personal jurisdiction over non-state residents to the extent Pennsylvania law allows. *See* Fed. R. Civ. P. 4(k). The Pennsylvania long-arm statute permits that jurisdiction may be based on the acts of an agent. Specifically, the statute provides, in pertinent part, "[a] tribunal of this Commonwealth may

exercise personal jurisdiction over a person … who acts directly or *by an agent*, as to a cause of action or other matter arising from such person … [t]ransacting any business in th[e] Commonwealth." 42 Pa. Cons. Stat. Ann. § 5322(a)(1) (emphasis added). Since jurisdiction over the instant action is based on diversity of citizenship, *see* 28 U.S.C. § 1332, this case requires the Court to apply Pennsylvania law to the parties' substantive claims.[20] *See Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91-92 (3d Cir. 2008).

Under Pennsylvania law, to establish the existence of an agency relationship, a party must show that: (1) there was a manifestation by the principal that the agent would act for it; (2) the agent accepted such an undertaking; and (3) the principal retained control of the endeavor. *Castle Cheese, Inc. v. MS Produce, Inc.*, Civ. No. 04-878, 2008 U.S. Dist. LEXIS 71053, at *27-28 (W.D. Pa. Sept. 19, 2008) (citing *Tribune-Review Publ'g Co. v. Westmoreland County Hous. Auth.*, 833 A.2d 112, 119-20 (Pa. 2003)). It is not necessary that the parties explicitly state their intention to create an agency relationship, but their intention must be clear from their conduct. *Goodway Mktg., Inc. v. Faulkner Adver. Assocs., Inc.*, 545 F. Supp. 263, 267 (E.D. Pa. 1982) (citing *Brock v. Real Estate-Land Title & Trust Co.*, 178 A. 146 (Pa. 1935)). The burden of establishing the existence of an agency relationship rests on the party making the assertion. *Goodway*, 545 F. Supp. at 267 (citing *Scott v. Purcell*, 415 A.2d 56, 60 n.8 (Pa. 1980)).

With respect to the first element, in *Basile v. H&R Block, Inc.*, the Pennsylvania Supreme Court observed that:

> The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability to actually bind the principal or alter the

[20] No party disputes the application of Pennsylvania state law to this matter. Accordingly, decisions of the Pennsylvania Supreme Court are binding precedent upon this Court, while Pennsylvania Superior Court decisions will be treated as persuasive precedent. *See State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 108 n.2 (3d Cir. 2009).

principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract.

761 A.2d 1115, 1121 (Pa. 2000). A principal manifests intent through written or spoken words or similar conduct. *Scott v. Lackey*, Civ. No. 02-1586, 2010 U.S. Dist. LEXIS 4350, at *22 (E.D. Pa. Jan. 20, 2010) (citing Restatement (Third) of Agency § 1.03). As to the third element, the principal's right to control the actions of the agent is a hallmark of an agency relationship. *Castle Cheese*, 2008 U.S. Dist. LEXIS 71053, at *29.

In the absence of an actual agency relationship, two individuals may form an affiliation based upon apparent agency.[21] *Lackey*, 2010 U.S. Dist. LEXIS 4350, at *22. Citing the Restatement (Second) of Agency, the Pennsylvania Supreme Court has explained that:

> Apparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power.

*Azur v. Chase Bank, USA*, 601 F.3d 212, 219 (3d Cir. 2010) (quoting *Revere Press, Inc. v. Blumberg*, 246 A.2d 407, 410 (Pa. 1968)). Apparent authority "flows from the conduct of the

---

[21] Pennsylvania law also recognizes theories of implied authority and agency by estoppel. *See Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987). Implied authority has been defined as the "authority to bind the principal to those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority." *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 545 (W.D. Pa. 2009). "A finding of express authority is, therefore, a prerequisite to the existence of implied authority." *Lackey*, 2010 U.S. Dist. LEXIS 4350, at *20 n.13 (citing *Friedman v. Kasser*, 481 A.2d 886, 890 (Pa. Super. Ct. 1984)). In addition, an agent may bind his or her principal by estoppel. *See Bolus*, 525 A.2d at 1221. "However, agency by estoppel may only arise from the conduct of the purported principal, and then only '[i]f the purported principal becomes aware that others are dealing with the purported agent in the mistaken belief that he is the agent of the purported principal and does not take reasonable steps to correct the mistake.'" *Lackey*, 2010 U.S. Dist. LEXIS 4350, at *20-21 n.13 (quoting *Diversified Packing & Dev. Corp. v. Dore & Assocs. Contracting, Inc.*, 48 F. App'x 392, 398 (3d Cir. 2002)); *see also McNeil Real Estate Fund XXVI, L.P. v. Matthew's, Inc.*, 112 F. Supp. 2d 437, 443 (W.D. Pa. 2000) (quoting *Apex Fin. Corp. v. Decker*, 369 A.2d 483, 486 (Pa. Super. Ct. 1976) ("Authority by estoppel occurs when a principal, by his culpable negligence, permits an agent to exercise powers not granted to him, even though the principal did not know or have notice of the agent's conduct.")). In the instant matter, the Court does not understand Plaintiff to argue an estoppel theory and, therefore, will not further entertain this theory of agency.

principal and not from that of the agent," *D & G Equip. Co. v. First Nat'l Bank*, 764 F.2d 950, 954 (3d Cir. 1985), and "requires a manifestation by the principal that 'another has authority to act with legal consequences' on his or her behalf," *Lackey*, 2010 U.S. Dist. LEXIS 4350, at *23 (quoting Restatement (Third) of Agency § 3.03). As articulated by the United States Court of Appeals for the Third Circuit, "under Pennsylvania law 'the test for determining whether an agent possesses apparent authority is whether a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise.'" *Azur*, 601 F.3d at 219 (quoting *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 345 (3d Cir. 2004)).

Although Pennsylvania law permits that jurisdiction may be based on the acts of an agent, the mere fact that a principal-agent relationship exists does not confer personal jurisdiction over a nonresident principal. *See Lackey*, 2010 U.S. Dist. LEXIS 4350, at *35-36 n.18 (citing *Nissley v. JLG Indus., Inc.*, 452 A.2d 865, 868 (Pa. Super. Ct. 1982) (holding that "it does not necessarily follow that the jurisdictional contacts made by the agent can be imputed back to the principal")); *see also Myelle v. Am. Cyanamid Co.*, Civ. No. 92-5243, 1993 U.S. Dist. LEXIS 3977, at *21 (E.D. Pa. Mar. 31, 1993) ("The proposition that the mere existence of an agency relationship satisfies the minimum contacts requirement, without more, holds no water."). Therefore, irrespective of any agency relationship, the Court must engage in a constitutional inquiry to determine whether Defendants are properly haled into this forum. *See Lackey*, 2010 U.S. Dist. LEXIS 4350, at *36 n.18.

### D.   *Specific Jurisdiction for Breach of Contract Claim*

Given the case *sub judice* involves allegations of breach of contract and intentionally tortious activity, i.e., fraudulent inducement, Plaintiff must satisfy two different three-prong tests

with respect to each Defendant to establish that this Court has specific jurisdiction over the entirety of his claims. The Court will first address the question of specific jurisdiction over the alleged contract claim.

The inquiry as to whether specific jurisdiction exists begins with the "traditional test." *See Shafik v. Curran*, Civ. No. 09-2469, 2010 U.S. Dist. LEXIS 60103, at *9-17 (M.D. Pa. June 17, 2010) (applying the traditional test to a contract dispute between forum and non-forum residents). The traditional test has three parts. *Marten*, 499 F.3d at 296 (citing *O'Connor*, 496 F.3d at 317). First, the defendant must have "'purposefully directed' his activities" at the forum. *Burger King*, 471 U.S. at 472 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). Second, the plaintiff's claim must "arise out of or relate to" at least one of those specific activities. *Helicopteros*, 466 U.S. at 414; *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559 (3d Cir. 1994). And, third, if the prior two requirements are met, courts may consider whether the exercise of jurisdiction "comport[s] with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320).

"In contract disputes, solicitation and formation of the contract itself are not dispositive." *Shafik*, 2010 U.S. Dist. LEXIS 60103, at *10; *see also Grand Entm't Group v. Star Medical Sales*, 988 F.2d 476, 482 (3d Cir. 1993) ("[A] contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum.'") (quoting *Burger King*, 471 U.S. at 478). Instead, the district court must consider the totality of the circumstances. *Telcordia Tech, Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d Cir. 2006). Whether the defendant is physically present in the forum state is not required, so long as the defendant "purposefully availed [himself] of the privilege of conducting activities within the forum," *O'Connor*, 496 F.3d at 317 (quoting *Hanson v. Deckla*, 357 U.S. 235, 253 (1958)), thus invoking the benefits and

protections of the forum state's laws. *See Shafik*, 2010 U.S. Dist. LEXIS 60103, at *10 (citing *Manfredy*, 238 F.3d at 255); *see also Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150-51 (3d Cir. 2001) ("In modern commercial business arrangements … communication by electronic facilities, rather than physical presence, is the rule.").

Specific factors to consider in determining personal jurisdiction over a breach of contract claim include:  the location and character of the contract negotiations, whether the non-resident solicited business from the forum state, whether the non-resident invoked and received benefits under the laws of the forum state, the contemplated future consequences of the contract, the terms and provisions of the contract, and the parties' course of dealing. *Manfredy*, 238 F.3d at 255-56; *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 151 (3d Cir. 1995); *Empire Abrasive Equip. Corp. v. H.H. Watson, Inc.*, 567 F.2d 554, 559 (3d Cir. 1977); *Strick Corp. v. A.J.F. Warehouse Distribs., Inc.*, 532 F. Supp. 951, 958 (E.D. Pa. 1982). However, it is not significant that one or the other party initiated the relationship. *See Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992).  "In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration." *Gen. Elec. Co.*, 270 F.3d at 151.  The Court now turns to the alleged intentional tort claim.

### E.  Specific Jurisdiction for Intentional Tort Claim

In addition to his breach of contract claim, Plaintiff has brought a claim against Defendants for fraudulent statements made to induce Plaintiff to enter a contract.  (*See* Docket No. 20 at 9-11).  With respect to specific jurisdiction over claims of intentional torts, the United States Court of Appeals for the Third Circuit has suggested that district courts should apply the "effects test," as established by the United States Supreme Court in *Calder v. Jones*, 465 U.S.

783 (1984).  *Shafik*, 2010 U.S. Dist. LEXIS 60103, at *18 (citing *Manfredy*, 238 F.3d at 258;

*Marten*, 499 F.3d at 297; *Miller Yacht Sales*, 384 F.3d at 99).  Under the effects test, the plaintiff

must show that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of

the harm in the forum such that the forum can be said to be the focal point of the harm suffered

by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct

at the forum such that the forum can be said to be the focal point of the tortious activity.  *IMO*

*Indus.*, 155 F.3d at 265-66.  If a plaintiff satisfies these three elements, the plaintiff can

"demonstrate a court's jurisdiction over a defendant even where the defendant's 'contacts with

the forum alone are far too small to comport with the requirements of due process' under the

[Court of Appeals'] traditional analysis."  *Marten*, 499 F.3d at 297 (quoting *IMO Indus.*, 155

F.3d at 259).

The crucial aspect of the effects test is that a plaintiff must demonstrate that a defendant

"expressly aimed its tortious conduct at the forum."  *CentiMark Corp. v. Highland Commercial*

*Roofing, LLC*, Civ. No. 09-1244, 2009 U.S. Dist. LEXIS 102530, at *8 (W.D. Pa. Nov. 4, 2009)

(quoting *IMO Indus.*, 155 F.3d at 266).  For this purpose, simply asserting that the defendant

knew or should have known that the plaintiff was located in the forum is insufficient.  *Shafik*,

2010 U.S. Dist. LEXIS 60103, at *18.  Likewise, the plaintiff's residence in the forum does not

on its own create jurisdiction over nonresident defendants.  *Marten*, 499 F.3d at 298.  Instead, to

establish that a defendant "expressly aimed" his conduct, the plaintiff has to demonstrate "the

defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious

conduct in the forum, and point to specific activity indicating that the defendant expressly aimed

[his] tortious conduct at the forum."  *Id.* at 297-98 (quoting *IMO Indus.*, 155 F.3d at 266).  If a

plaintiff fails to show that the defendant "manifest[ed] behavior intentionally targeted at and

focused on the forum," *IMO Indus.*, 155 F.3d at 265, the plaintiff fails to establish jurisdiction under the effects test. *Marten*, 499 F.3d at 298.

V.     DISCUSSION

In the present case, Plaintiff argues that under the "traditional test," jurisdiction lies with this Court because Defendants directed their activities at Pennsylvania, and Plaintiff's breach of contract claim arises from Defendants' acts. (Docket No. 49 at ¶¶ 17, 18, 20, 21 24). Specifically, Plaintiff asserts that Defendants utilized Mr. Radovcic as an agent in Pennsylvania, and that Mr. Radovcic solicited Plaintiff's business on Defendants' behalf in Pennsylvania. (*Id.* at ¶¶ 16, 17). Plaintiff also claims that Defendants' contacts were "instrumental" in the formation of the contracts at issue. (*See* Docket No. 20 at ¶¶ 34-49; *see also* Docket No. 49 at ¶ 19). Plaintiff also invokes the "effects test" when stating that Defendants' allegedly fraudulent actions were directed at Plaintiff in Pennsylvania, that he suffered the brunt of his injuries here, and that Defendants were aware that the consequences of their actions would result in Pennsylvania. (*See* Docket No. 49 at ¶¶ 17, 18, 23, 25). Defendants challenge Plaintiff's claim that jurisdiction is proper. (*See* Docket Nos. 50, 51).

A.   *Defendants Are Not Subject to Specific Jurisdiction for Plaintiff's Breach of Contract Claim*

As an initial matter, the Court finds that Mr. Radovcic is not an agent of either Defendant Quickel or Yates. Plaintiff has not proven that Mr. Radovcic possessed express authority to act on behalf of Defendants. Indeed, there is no evidence that Defendants manifested any intention for Mr. Radovcic to act as a "commissioned sales agent" on their behalf. (*See* Docket No. 20 at ¶ 6). Defendants never entered into any sort agreement—formal or informal—with Mr. Radovcic, nor did he receive any commission or other form of compensation. Furthermore, there is no

evidence that Defendants instructed Mr. Radovcic to meet with Plaintiff, or to solicit Plaintiff to invest in Sailview.

Plaintiff has also failed to prove that Mr. Radovcic enjoyed apparent authority to speak on Defendants' behalf. Plaintiff testified that he learned of Sailview through a meeting with Mr. Radovcic, which occurred at Plaintiff's business office in Wexford, Pennsylvania. (Docket No. 45 at 9). Defendants, however, did not direct Mr. Radovcic to find purchasers or investors for Sailview. (*See* Docket No. 48 at 39). Moreover, Defendant Quickel testified that he has no knowledge that anyone else associated with Sailview did likewise. (*Id.*).

In this Court's estimation, there is no evidence that either Defendant acted in a manner that would allow a person of "ordinary prudence, diligence and discretion" to believe that Mr. Radovcic possessed the authority he purported to exercise. *See Azur*, 601 F.3d at 219 (quoting *In re Mushroom*, 382 F.3d at 345). To this end, the Court notes that Plaintiff testified that after he had performed some due diligence, he "became somewhat uncomfortable with some of [Mr. Radovcic's] prior relationships." (Docket No. 45 at 21-22). In fact, according to his testimony, prior to the date of the initial Option Agreement, Plaintiff communicated his discomfort to Defendant Yates, who then indicated that he, too, felt uneasy about Mr. Radovcic. (*See* Docket No. 45 at 21-22, 112-13). This being the case, and recognizing that apparent authority focuses on the actions of the principal as compared to the agent, the Court is constrained to hold, based on the evidence before it, that a reasonable person would conclude that when Mr. Radovcic spoke with Plaintiff that he did so on Defendants' behalf. *See D & G Equip.*, 764 F.2d at 954. Consequently, the Court may not exercise personal jurisdiction on the basis of an agency relationship, and must instead exam Defendants' contacts with the forum to determine whether personal jurisdiction exists. *See Lackey*, 2010 U.S. Dist. LEXIS 4350, at *29.

In support of his argument that personal jurisdiction is lacking, Defendant Quickel contends that he never met with Plaintiff in Pennsylvania, that he engaged in only limited telephone and email communications with Plaintiff, and that he did not know where Plaintiff was located when he engaged in said communications. (Docket No. 50 at ¶¶ 16, 17). Similarly, Defendant Yates asserts that he has never undertaken or participated in any real estate development projects in Pennsylvania and has likewise never had any business dealings in Pennsylvania. (Docket No. 51 at ¶ 12). Collectively, Defendants argue that minimum contacts for Plaintiff's breach of contract claim do not exist merely because Defendants exchanged phone calls and emails with Plaintiff, entered into a contractual relationship with him, and accepted funds from a Pennsylvania bank.[22] (*See* Docket No. 50 at ¶¶ 19, 20; *see also* Docket No. 51 at ¶¶ 18, 23). Defendants also contend that the unilateral activity of Plaintiff is not an appropriate consideration within the context of the instant motion and that a choice of law provision, standing alone, is insufficient to confer jurisdiction. (*See* Docket No. 50 at ¶ 33; *see also* Docket No. 51 at ¶ 14, 15, 19).

To resolve the parties' dispute, the Court notes initially that both Defendants in this case are shareholders and directors of Sailview. (Docket No. 48 at 6-7, 91). "In certain situations, 'jurisdiction over corporate officers in their personal capacities may be based on acts performed in their corporate capacity.'" *Hyndman v. Johnson*, Civ. No. 10-7131, 2011 U.S. Dist. LEXIS 14871, at *11 (E.D. Pa. Feb. 15, 2011) (quoting *American Int'l Airways, Inc. v. American Int'l Group, Inc.*, Civ. No. 90-7135, 1991 U.S. Dist. LEXIS 6888, at *10 (E.D. Pa. May 21, 1991)). Specifically, "when personal jurisdiction is based on an officer's corporate activities, only those actions taken within the forum state are to be considered in the jurisdictional analysis."

---

[22] Given the circumstances of this case, the jurisdictional analysis for each Defendant is virtually identical. Thus, the Court considers the Court's jurisdiction as to each Defendant within the same analysis.

*Hyndman*, 2011 U.S. Dist. LEXIS 14871, at *12 (citation omitted). "Otherwise, 'an individual's transaction of business solely as an officer or agent of a corporation does not create personal jurisdiction over that individual.'" *Id.* (quoting *Feld v. Tele-View, Inc.*, 422 F. Supp. 1100, 1104 (E.D. Pa. 1976)).

Here, it is clear to the Court that the majority of the contacts relied on by Plaintiff in his attempt to establish personal jurisdiction over Defendants were made on behalf of Sailview, which is not a party to this action, and not on behalf of the individual Defendants. (*See* Docket No. 20). As such, the record is equally clear that none of Defendants' respective activities as corporate officers took place in Pennsylvania. (*See* Docket No. 48 at 4, 90). Indeed, as provided in their testimony, prior to the evidentiary hearing held on December 2, 2010, neither Defendant Quickel nor Yates had ever traveled to Pennsylvania. (*Id.*). Therefore, within the standard adopted by district courts sitting in the Eastern District for similar situations, the majority of the contacts relied on by Plaintiff to satisfy the Court's test for specific jurisdiction are not to be considered. *See Hyndman*, 2011 U.S. Dist. LEXIS 14871, at *12.

However, even without excluding the contacts that Plaintiff alleges were instrumental in the formation of the contracts at issue, (*see* Docket No. 49), this Court is able to conclude that it lacks personal jurisdiction over either Defendant as to Plaintiff's breach of contract claim based on the following case law.

In *Rotondo Weinreich Enterprises, Inc. v. Rock City Mechanical, Inc.*, the district court held that:

> Where the only contacts an out of state defendant has with the forum state are that it concluded a contract with a forum state plaintiff and sent some related communications to that plaintiff, and where the contract negotiations were initiated by the plaintiff, the contract is to be performed entirely outside the forum state, the contract does not contain a choice-of-law clause designating the application of forum state law, and the contract does not create long-term or

substantial ties with the forum state, the defendant does not have sufficient contacts.

Civ. No. 04-5282, 2005 U.S. Dist. LEXIS 764 (E.D. Pa. Jan. 19, 2005).  Similarly, in *Novacare, Inc. v. Strategic Theracare Alliance*, the court concluded that it lacked personal jurisdiction over the non-resident defendants, whose contracts to provide services in their home state were made with a Pennsylvania corporation; contained notice provisions indicating the plaintiff's Pennsylvania address; contained Pennsylvania choice of law provisions; and resulted in significant correspondence, payments by check, and occasional telephone contact—each by the defendant to the plaintiff in Pennsylvania.  Civ. No. 98-625, 1999 U.S. Dist. LEXIS 6108 (Apr. 30, 1999); *see also Budget Blinds, Inc. v. White*, 536 F.3d 244, 261-263 (3d Cir. 2008) (indicating that although a choice-of-law provision may reinforce a party's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there," a court should hesitate to attribute such a meaning to the provision if it has been changed at the insistence of the forum resident) (quoting *Burger King*, 471 U.S. at 482).

Counseled by these decisions, this Court thus concludes that Plaintiff's presence in Pennsylvania, the inclusion of Pennsylvania identification and notice provisions in the agreements at issue, the Pennsylvania choice of law provision, and the agreement-related telephone and email correspondence between Plaintiff and Defendants are insufficient to support an exercise of specific personal jurisdiction over Plaintiff's breach of contract claim against the named Defendants.

B. *Defendants Are Not Subject to Specific Jurisdiction for Plaintiff's Intentional Tort Claim*

With respect to the claim for fraud in the inducement, Plaintiff's allegations relate to Defendants' representations providing that:  (1) Defendants raised sufficient capital to break

ground on construction of the development; (2) Defendants had commitments for the sale of units in the development; (3) Defendants had the financial wherewithal to complete the development; and (4) Plaintiff's advance under the agreements in question would be secured by a lien against the development's real estate. (Docket No. 20 at ¶ 42).

To meet the "effects test" for both Defendants, Plaintiff has the burden of establishing that: (1) each Defendant committed an intentional tort; (2) Plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by Plaintiff as a result of those torts; and (3) each Defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *See IMO Indus.*, 155 F.3d at 265-66. Only if all three facts are found may the Court exercise personal jurisdiction under this test. *See Marten*, 499 F.3d at 297. As Plaintiff has failed to show that either Defendant Quickel or Yates "expressly aimed" the alleged tortious conduct at Pennsylvania in a way that could make Pennsylvania the focal point of their claimed tortious activity, he has not met his burden under the effects test with regard to either Defendant. Accordingly, the Court finds that personal jurisdiction does not exist over Defendants as to Plaintiff's claim for fraudulent inducement.

VI.    TRANSFER

Having concluded that this Court lacks personal jurisdiction over Defendants, the question remains whether the Court should dismiss this action or transfer it to the Western District of North Carolina. *See Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 544 (3d Cir. 1985) (stating that a district court lacking personal jurisdiction can transfer a case to a district in which the case could have originally been brought). Although Plaintiff has not expressly renewed his request that the case be transferred as an alternative to dismissal, (*see*

Docket Nos. 49, 52), the Court acknowledges his prior request, (*see* Docket No. 25 at 20), and further recognizes *sua sponte* its authority under 28 U.S.C. § 1631 to transfer this matter to a judicial district where the matter could have been brought.[23]  *See Junge v. Wheeling Island Gaming, Inc.*, Civ. No. 10-1033, 2010 U.S. Dist. LEXIS 116484, at *20 (W.D. Pa. Nov. 2, 2010) (holding that transfer under 28 U.S.C. §  1631 is proper even if the parties do not invoke said provision) (citing *Chicosky v. Presbyterian Med. Ctr.*, 979 F. Supp. 316, 320-23 (D.N.J. 1997)).

> The language of Section 1631 provides, in pertinent part:

> Whenever a civil action is filed in a court … and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed …, and the action … shall proceed as if it has been filed in … the court to which it is transferred on the date upon which it was actually filed in … the court from which it is transferred.

28 U.S.C. § 1631.  In this case, the interests of justice are better served if this case is transferred to the Western District of North Carolina rather than dismissed.[24]  Personal jurisdiction over Defendants and venue are proper in that court.  Moreover, such a transfer will serve the interests of justice because it will eliminate the need for Plaintiff to incur additional filing costs and will avoid any statute of limitations problems that could arise from an outright dismissal at this point. *See Lawman Armor Corp. v. Simon*, 319 F. Supp. 2d 499, 507 (E.D. Pa. 2004) ("[N]ormally transfer will be in the interest of justice because dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating.").  By transferring this action to a district court in the State of North Carolina, the Court is not unmindful of the potential financial hardship and inconvenience that Plaintiff may incur as the result of such a transfer.  Nonetheless,

---

[23]At the hearing held on December 2, 2010, the Court notes Defense counsel acknowledged that the potential transfer of this case to the Western District of North Carolina had been raised as an alternative to dismissal. (*See* Docket No. 45 at 189).

[24] Because the Court finds that transfer of this case is appropriate, it expresses no opinion on Defendants' arguments that Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted, believing those decisions are better left to the North Carolina court.

cost and inconvenience to Plaintiff do not entitle the Court to disregard well-established jurisdictional requirements. *See Castapheny v. W. Va. State Police*, Civ. No. 09-424, 2010 U.S. Dist. LEXIS 45981, at *25-26 (W.D. Pa. Apr. 15, 2010).

VII.    CONCLUSION

Based on the foregoing, the Court finds that Defendants are not subject to personal jurisdiction in Pennsylvania. However, because the action could have originally been brought in the Western District of North Carolina and because a transfer is in the interest of justice, the action will be transferred to that district, rather than dismissed, pursuant to 28 U.S.C. § 1631. An appropriate Order follows.

<u>*s/Nora Barry Fischer*</u>
Nora Barry Fischer
United States District Judge

Date:   April 11, 2011

cc/ecf: All counsel of record.